[Cite as *State v. Cassano*, 2012-Ohio-4047.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
## No. 97228

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ADAM CASSANO

DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-535072

**BEFORE:** Stewart, P.J., Boyle, J., and Rocco, J.

**RELEASED AND JOURNALIZED:** September 6, 2012

[Cite as *State v. Cassano*, 2012-Ohio-4047.]

**ATTORNEY FOR APPELLANT**

Robert A. Dixon
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, OH    44103


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY:    Stephanie Heibertshausen
               John Wojton
Assistant County Prosecutors
The Justice Center
1200 Ontario Street, 9th Floor
Cleveland, OH    44113

[Cite as *State v. Cassano*, 2012-Ohio-4047.]
ON RECONSIDERATION[1]

MELODY J. STEWART, P.J.:

{¶1} Defendant-appellant Adam Cassano was found guilty by the trial court of four counts of felonious assault, two counts of aggravated robbery, and two counts of having a weapon while under disability. The state charged that Cassano, acting on information provided by codefendant Jerrell Glenn, robbed a group of victims, shooting two of them. The issues on appeal concern the sufficiency and weight of the evidence, the admission of telephone text messages, ineffective assistance of counsel, and the court's failure to merge firearm specifications at sentencing.

I

{¶2} The first and second assignments of error raise issues relating to the weight and sufficiency of the evidence. Cassano does not make a specific argument as to why there was insufficient evidence to support his convictions. Instead, he refers us to the arguments made in support of arguments for why the court's judgment is against the manifest weight of the evidence. This fails the App.R. 16(A)(7) requirement that the appellant present an "argument with respect to each assignment of error presented for

---

[1] The original announcement of decision, *State v. Cassano*, 8th Dist. No. 97228, 2012-Ohio-3073, released July 5, 2012, is hereby vacated. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal. *See* App.R. 22(C); *see also* S.Ct.Prac.R. 2.2(A)(1).

review[.]" *State v. Sparent*, 8th Dist. No. 96710, 2012-Ohio-586, ¶ 11. We consider only the argument that the court's judgment is against the manifest weight of the evidence.

{¶3} Cassano's manifest weight of the evidence argument is simply that the court lost its way by finding that he was the gunman who robbed and shot two of the victims. His argument rests primarily on the state's use of certain text messages sent by codefendant Glenn that appeared to tell the recipient the time and location that Glenn and the victims would arrive at a certain location. The state theorized that these messages were sent by Glenn to guide Cassano to a place where the robbery could be committed. Cassano argues that the state failed to prove that he was the recipient of Glenn's text messages and, given the victims' failure to identify him as the shooter, there was significant doubt whether he was correctly convicted.

{¶4} The manifest weight of the evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 340, 515 N.E.2d 1009 (9th Dist.1986). The use of the word "manifest" means that

the trier of fact's decision must be plainly or obviously contrary to all of the evidence. This is a difficult burden for an appellant to overcome because the resolution of factual issues resides with the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E .2d 548 (1964).

{¶5} The state's evidence showed that the victims, accompanied by Glenn, visited several bars during an evening out. One of those victims, Kenneth Elsleger, was known by Glenn to be a drug dealer who carried large amounts of cash. As the group was returning to Elsleger's apartment at about 2:30 a.m., one of them noticed Glenn was sending text messages from his telephone, but trying to hide the telephone's screen from view of the others as he did so. When they arrived and parked at Elsleger's apartment, the group exited the car. One of the victims noticed that Glenn immediately ran away. A few minutes later a male approached Elsleger and asked for help lighting a cigarette. The male then pulled a gun, fired a single shot in the air, and demanded that Elsleger empty his pockets. Elsleger began moving backwards and watched as his brother grabbed the male's arm. The male apparently threw the brother to the ground and then ripped away a

necklace that Elsleger was wearing. The male then shot Elsleger in the neck. The brother regained his footing and grappled with the male, but he, too, was shot in the scuffle. The male then fled.

{¶6} The victims were unable to identify their assailant from photo arrays. Three of the four victims described the robber as short, white, and bald; the fourth believed that the robber was African-American, but allowed that she might have mistakenly reached that conclusion because the male was wearing a dark, hooded sweatshirt that cast a shadow over his face.

{¶7} A fresh covering of snow had fallen on the evening of the robbery. The police discovered footprints and tire marks leading away from the scene. They followed the footprints to the front entrance of another apartment complex within walking distance of the shooting. An unidentified male who matched the general description of the robber exited the building. A police officer asked him if he had been in the building all night. The male told them that he had just arrived at the building. The officer who spoke with the male noticed that he appeared "very nervous," was giving "disjointed partial answers," and could not explain who dropped him off or how he arrived at the building.

{¶8} As the unidentified male was speaking to the police, Glenn exited the building and greeted the male. Glenn told the police that he knew the

male. He also told the police that he had been inside an apartment all night. The police took Glenn up to the apartment and learned from the occupants that Glenn had only just arrived at the apartment and that it was the male who had been at the apartment all evening.

{¶9} When confronted with information that he had not been in the apartment all evening, Glenn admitted that he had been with the group of victims that evening. He said that his car was parked at his residence and that he started to walk back to his apartment as soon as the group of victims arrived at the crime scene. The police were skeptical of this account because Glenn's apartment was more than two miles away and it made no sense to them that Glenn would walk that distance at 2:30 a.m. in falling snow. As the police were preparing to give Glenn a ride to his house from the police station, one of the victims casually asked them if they were taking Glenn back to the scene of the crime so he could get his car. Glenn continued to insist that he did not drive his car that evening, but the police soon discovered a car at the crime scene that was registered to Glenn.

{¶10} With Glenn now a person of suspicion, the police obtained a record of Glenn's cell phone activity after he provided his telephone number. These records showed that he sent a number of text messages shortly before the robbery to the same telephone number. Those messages appeared to be

directing the recipient of the text messages to the parking lot where the robbery occurred, and more specifically to the location of Glenn's car in that lot. The recipient's text messages in reply showed that the recipient was having difficulty locating the car because the parked cars were covered with snow. A final message from Glenn was: "we on our way."

{¶11} Although the police knew the number of the telephone that received Glenn's text messages, that telephone was registered to a "pay as you go" cell phone carrier that did not keep subscriber information. Looking at call records from what we will refer to as the "recipient telephone," the police discovered that the recipient telephone had made calls to a telephone owned by Cassano's mother at the house where he, too, resided. They also learned that Cassano's brother had called the recipient telephone. In addition, the police learned that the day after Cassano had been interviewed by the police, Glenn unsuccessfully attempted to call the recipient cell phone and then immediately called the Cassano residence telephone.

{¶12} Using this information, the police obtained and executed a search warrant at Cassano's residence. They found an ammunition clip from a 9mm Glock handgun. The discovery of the ammunition clip was significant because shell casings found at the scene of the robbery were thought to be most likely fired from a 9mm Glock handgun. The police did not find a Glock

handgun, but they found a photograph of Glenn and Cassano posing with a female.

{¶13} Because none of the victims could positively identify Cassano as the robber, the state relied on circumstantial evidence. Unlike direct evidence in which a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish, circumstantial evidence requires the drawing of inferences that are reasonably permitted by the evidence. Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence — circumstantial evidence carries the same weight as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). The Ohio Supreme Court has "long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990).

{¶14} Cassano's argument is built on two points: the state could not definitively prove that he was the recipient of Glenn's text messages on the

night of the robbery and none of the witnesses positively identified him as the robber.

{¶15} It is true that the state's evidence concerning the recipient of Glenn's text messages did not directly identify Cassano — the recipient number was for a prepaid phone that did not provide subscriber information. But the circumstantial evidence allowed the court to infer reasonably that Cassano was in possession of the telephone at the time of the robbery. Glenn admitted that he and Cassano were friends, so it was not out of the question that Glenn would have messaged Cassano. Records from Glenn's telephone showed that after Cassano had been interviewed and released by the police, Glenn first tried to call the recipient telephone number and then immediately called the land line number associated with Cassano's residence.

{¶16} The nature of the text messages were such that they could be reasonably interpreted as directing the recipient to the crime scene. Although none of the victims could specifically identify Cassano from photo arrays, they were able to give a general description of height, weight, and baldness that matched Cassano.

{¶17} At trial, Cassano contradicted the statements he made to the police shortly after the robbery by offering a new alibi — he had been at a strip bar on the evening of the robbery until the bar closed at 2:30 a.m. His

alibi witnesses, all of whom claimed to be friends with Cassano, firmly recalled his presence at the bar because of an incident between Cassano and a dancer who threw roses at Cassano. There was some uncertainty as to the exact date on which this incident occurred. One alibi witness testified that she had been at the strip bar on a Thursday/Friday, but this did not help Cassano because the robbery occurred in the very early hours of a Saturday. The witness later claimed (prompted by a calendar offered to her by defense counsel on redirect examination), that she had her dates mixed up and that the incident did occur on a Friday/Saturday. The dancer who threw the roses at Cassano was even more unclear as to the exact date this incident occurred and could only say that it may have occurred on either a Friday or a Saturday. Given the conflicting accounts of the alibi from both Cassano and his witnesses, the court undoubtedly believed that they lacked credibility.

{¶18} In addition to evidence suggesting that Glenn sent messages to Cassano's telephone and that Cassano had offered a doubtful alibi, the state offered evidence that Cassano was in possession of an ammunition clip for a Glock handgun. While the police did not recover the actual gun used during the commission of the robbery, the court could reasonably believe that there would be no practical explanation for Cassano having ammunition for a non-existent gun.

{¶19} As with all circumstantial evidence, nothing in the state's case directly proved that Cassano was the robber. But the state's evidence could well have convinced the court that the application of various facts formed a larger picture that, when viewed as whole, made a compelling case for Cassano's guilt. To find otherwise would be to say that Cassano was the victim of circumstances that were too far beyond the realm of pure coincidence to be believable. The first and second assignments of error are overruled.

## II

{¶20} A major portion of the state's case consisted of the text messages sent from Glenn's telephone on the night of the robbery. Cassano next argues that, as to him, these text messages were inadmissible hearsay, offered for the truth of what was stated in those messages. Although he concedes that the text messages might have been admissible against Glenn as admissions, he argues that any connection between those text messages and himself was just "theory" at the time the court admitted them. The state maintains that the text messages were offered as business records.

{¶21} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Even though classified as hearsay,

certain evidence is nonetheless admissible under exceptions to the Rules of Evidence. As applicable here, the court admitted the telephone records under the business record exception listed in Evid.R. 803(6). That rule excepts business records from exclusion at trial if they are made in the course of a regularly conducted business activity because the courts presume that such records are trustworthy given the self-interest to be served by the accuracy of such entries. *Weis v. Weis*, 147 Ohio St. 416, 425-426, 72 N.E.2d 245 (1947).

{¶22} To qualify for the business-records exception, a record must meet the following criteria: (1) the record must be one recorded regularly in a regularly conducted activity, (2) a person with knowledge of the act, event, or condition recorded must have made the record, (3) it must have been recorded at or near the time of the act, event, or condition, and (4) the party who seeks to introduce the record must lay a foundation through testimony of the record custodian or some other qualified witness. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 171.

{¶23} Cassano argues that a representative of Verizon Wireless, the carrier for Glenn and the parent company of a subsidiary wireless service that acted as the carrier for the recipient telephone, was not allowed by the court to testify to how the cell phone records were compiled and whether the

method of record retention was reliable. This is not accurate. The representative testified that the records were maintained in the "normal course of business activity" through an automated computer system. That testimony alone was sufficient to establish the prerequisites for admitting the text messages as business records.

{¶24} The court did sustain a defense objection to the representative's statement that the records were "reliable." The reliability of evidence has two components here. Proper authentication of a business record under Evid.R. 901(A) requires that a proponent of a document produce "evidence sufficient to support a finding that the matter in question is what the proponent claims it to be." *State v. Easter*, 75 Ohio App.3d 22, 25, 598 N.E.2d 845 (4th Dist.1991). To do this, a witness must "testify as to the regularity and reliability of the business activity involved in the creation of the record." *State v. Hirtzinger*, 124 Ohio App.3d 40, 49, 705 N.E.2d 395 (2d Dist. 1997). This goes to the fundamental reason why the courts allow certain forms of hearsay into evidence. As business records, the text messages are deemed inherently trustworthy because we assume Glenn's cell phone carrier had a particular self-interest in the accuracy of the records it produced.

{¶25} This form of reliability must not be confused with the reliability or credibility of the text messages as evidence that implicated Cassano in the robbery. When viewed in context, the court's statement about whether the text messages were "reliable" was not that the text messages were not reliable as business records (they were), but whether they credibly showed that Cassano had been the recipient and sender of the text messages when there was no direct evidence to show that he received and sent those messages. That kind of reliability was a matter for the court to determine, so the court properly sustained an objection to a question that might have allowed the cell phone representative to give an opinion that encroached into the court's factfinding function.

{¶26} But whether the court was wrong to admit the text messages under the business record exception to the hearsay rule is of no consequence because two possible outcomes existed from the use of the evidence, neither of which benefit Cassano. If the court was to find from the circumstantial evidence that Cassano owned the recipient telephone, any text messages sent from the recipient telephone were nonhearsay as admissions under Evid.R. 801(D)(2), consistent with Cassano's concession that the text messages sent from Glenn's telephone were admissions against Glenn. Alternatively, if the court was to find that Cassano did not own or was not using the recipient

telephone, the text messages would have no prejudical effect whatsoever on Cassano because they would not have been evidence implicating Cassano.

{¶27} This is exactly what the court concluded after extensive discussions on whether to allow the text messages into evidence. The court confirmed that if it concluded that Cassano did not own the recipient telephone, the text messages sent from that telephone would not constitute proof against Cassano and their admission would not "hurt" him. It ultimately allowed them as having "some relevance."

{¶28} Exactly what relevance and weight the court gave to the text messages is unclear because the court gave no reasons for its guilty finding. Cassano finds it "unsettling" that the court did not alert counsel prior to delivering the verdict that it gave weight to the text messages in its deliberations, but the court was under no obligation to do so and it is unclear just how Cassano might have benefitted from prior notice. He claims that he would have filed a motion for a mistrial based on a *Bruton* violation, but as we address in the following section, a motion on those grounds would not have been viable. While the court's basis for admitting the text messages might have been equivocal, no error is manifest, so we have no basis for finding that the court abused its discretion by admitting the text messages. Our conclusion necessarily moots consideration of Cassano's fifth assignment

of error, which claims that he was denied due process because the court erroneously considered the cell phone records.

## III

**{¶29}** For his fourth assignment of error, Cassano argues that trial counsel was ineffective for failing to request a mistrial under the *Bruton* rule when the state introduced Glenn's text messages. He argues that the admission of a series of text messages between him and Glenn were statements of a coconspirator in furtherance of a conspiracy that should not have been admitted against him.

**{¶30}** In *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the United States Supreme Court held that the confession of a codefendant who exercises his or her Fifth Amendment right not to testify is not admissible against the other defendant because that defendant has no opportunity to cross-examine the confessing codefendant. But the admission of nonhearsay is not a *Bruton* violation. *United States v. Inadi*, 475 U.S. 387, 398, 106 S.Ct. 1121, 1128, 89 L.Ed.2d 390, fn. 11 (1986) (stating that nonhearsay does not violate the defendant's right to confront witnesses); *White v. Lewis*, 874 F.2d 599, 603 (9th Cir.1989) ("Because this testimony was not used for the truth of the matter asserted by the

out-of-court declarant, it was not hearsay, and *Bruton* is inapposite.") If, as Cassano concedes, the text messages sent by Glenn constituted admissions by him, they were nonhearsay and *Bruton* does not apply.

{¶31} Even if Glenn's text messages were not considered nonhearsay, Cassano would have no confrontation argument because the *Bruton* rule applies to trials by juries. Cassano waived the right to a trial by jury and elected to be tried by the court. In *Lee v. Illinois*, 476 U.S. 530, 542, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), the court noted that the admission of a non-testifying codefendant's confession in a joint bench trial was "not strictly speaking a *Bruton* case because we are not here concerned with the effectiveness of limiting instructions in preventing spill-over prejudice to a defendant." And courts have held that "the *Bruton* rule is inapplicable to the incriminating confession of a non-testifying codefendant in a joint bench trial." *Johnson v. Tennis*, 549 F.3d 296, 298 (3d Cir. 2008); *In re Jones*, 1st Dist. Nos. C-090497 and C-090499, 2010-Ohio-3994, ¶ 24. This is because the law "recognizes the presumption that a judge in a bench trial has no difficulty in disregarding inadmissible evidence in reaching his verdict[.]" *United States. v. Cardenas*, 9 F.3d 1139, 1155 (5th Cir.1993).

IV

{¶32} Finally, Cassano complains that the court erred by sentencing him to three consecutive three-year terms on firearm specifications. The three firearm specifications related to the felonious assault and aggravated robbery counts against Elsleger and a single count of felonious assault against the brother. Cassano argues that the firearm specifications should have merged because he claims they all derived from "a continuous sequence of events, connected in time and space."

{¶33} Ordinarily, the court is forbidden from imposing sentence on multiple firearm specifications for "felonies committed as part of the same act or transaction." *See* former R.C. 2929.14(D)(1)(b) [now R.C. 2929.14(B)(1)(b)]. However, that section applies only to the extent that former R.C. 2929.14(D)(1)(g) [now R.C. 2929.14(B)(1)(g)] does not apply. Former R.C. 2929.14(D)(1)(g) states:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division

(B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty *and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.* (emphasis added).

**{¶34}** Cassano was found guilty of committing two or more felonies. One of those felonies was felonious assault, and he was found guilty of firearm specifications under former R.C. 2929.14(D)(1)(a) [now R.C. 2929.14(B)(1)(a)]. Under former R.C. 2929.14(D)(1)(g), the court was required to impose on Cassano prison terms for the two most serious specifications, and could also, in its discretion, impose sentence for any other specifications. *State v. Worth*, 10th Dist. No. 10AP-1125, 2012-Ohio-666, ¶ 96; *State v. Beatty-Jones*, 2d Dist. No. 24245, 2011-Ohio-3719, ¶ 16. The court imposed sentence on all three firearm specifications and Cassano makes no argument that the court abused its discretion by doing so. We thus have no basis for finding an abuse of discretion necessary to overturn the imposition of the consecutive sentence for three firearm specifications.

**{¶35}** Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas  to carry this judgment into execution.   The defendant's conviction having been affirmed, any bail pending appeal is terminated.   Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MELODY J. STEWART, PRESIDING JUDGE

KENNETH A. ROCCO, J., CONCURS;

MARY J. BOYLE, J., CONCURS IN JUDGMENT
ONLY WITH SEPARATE OPINION

MARY J.   BOYLE, J., CONCURRING IN JUDGMENT ONLY:

{¶36} Upon reconsideration, I do not agree that App.R. 16(A)(7) is applicable with respect to Cassano's second assignment of error.   I believe that Cassano has adequately raised a sufficiency challenge to his conviction and would therefore address his sufficiency challenge.   But after having applied the appropriate review, I find that the evidence is legally

sufficient to sustain the verdict and would therefore overrule the second assignment of error on

this basis.     *See State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

[Cite as *State v. Cassano*, 2012-Ohio-4047.]