[Cite as *State v. Kirks*, 2024-Ohio-468.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                  :

    Plaintiff-Appellee,                  :

                                        No. 112473

    v.                                   :

MARCUS KIRKS,                                   :

    Defendant-Appellant.                 :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 8, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-668950-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and John Hirschauer, Assistant Prosecuting Attorney, *for appellee.*

Allison F. Hibbard, *for appellant.*


FRANK DANIEL CELEBREZZE, III, J.:

{¶ 1} Appellant Marcus Kirks ("appellant") brings this appeal challenging his conviction by the Cuyahoga County Court of Common Pleas of numerous charges including aggravated murder, murder, felonious assault, and aggravated burglary.

After a thorough review of the applicable law and facts, we affirm the judgment of the trial court.

## I. Factual and Procedural History

{¶ 2} This matter arises from the shooting death of 29-year-old Deandre Graham ("Graham") in October 2021. Graham had been dating Angel Brown ("Brown") on and off for over two years at the time of his death. On the night of the shooting, Graham had gone over to Brown's house, which was a duplex on East 47th St. in Cleveland.

{¶ 3} Appellant is the former boyfriend of Brown. They had stopped seeing each other in 2019 and had not spoken for some time until several weeks prior to the shooting. At that time, they had run into each other at a gas station and had become friendly again, texting and calling each other. Appellant's number was saved in Brown's phone under the nickname "My Giant."

{¶ 4} On the night in question, Brown and Graham had engaged in sexual relations and later, Brown heard tapping on the back door, which was glass. She looked out and because it was dark, she could only see a tall male with a silver handgun. She told Graham about it, and he pulled her away from the window. He looked out the window himself and was shot through the window. The bullet hit him in the neck, and he died from the wound.

{¶ 5} In the ten days leading up to the shooting, Brown and appellant had communicated via cell phone nearly every day. On the night of the shooting, appellant called Brown several times after 2:30 a.m.; all of the calls went

unanswered. He then texted, "Well, I'm on my way," and then "Tell yo (sic) side[1] to leave now." These texts were sent just minutes prior to the shooting.

{¶ 6} Brown called appellant after the shooting and asked why he had called her. He told her that he was drunk and did not remember the reason. He stated that he was at The Dstrkt Lounge in Cleveland that night but that he was home at 2:54 a.m.

{¶ 7} A surveillance camera at a funeral home captured a silver Mercedes Benz that drove by and parked near Brown's residence. The video was not clear enough to show the license plate of the vehicle; however, a 2015 silver Mercedes Benz was registered to appellant. Police were able to utilize the footage from various city surveillance cameras to track the vehicle as it had made its way from East 26th St. and St. Clair Avenue, the direction of the Dstrkt Lounge, to the vicinity of Brown's residence. After the vehicle left the scene, cameras showed it heading eastbound until around the intersection of St. Clair Avenue and Addison Road.

{¶ 8} Police were able to subpoena appellant's cell phone number and determine the area where his cell phone was located in the minutes prior to and after the shooting. At the time the homicide occurred, appellant's cell phone had connected to the cell phone tower that was in the general area of Brown's residence.

---

[1] Brown testified that "side" meant "someone that you cheat on outside of your relationship" and acknowledged that it was basically "someone that you're sleeping with." She denied that Graham was a "side."

{¶ 9} The day after the shooting, appellant began using a new cell phone with a different number. He sent messages to his contacts telling them to erase his old number and only use the new one.

{¶ 10} Appellant was arrested and told police that he had not seen or talked to Brown in over a year and a half. When asked about what vehicles he owned or that were registered to him, he did not mention the Mercedes Benz. Regarding his cell phone, appellant denied using the number that had been subpoenaed by police and denied that he had texted or called Brown.

{¶ 11} Appellant was charged with two counts of aggravated murder (Counts 1 and 2), two counts of murder (Counts 3 and 4), three counts of felonious assault (Counts 5, 6, and 8), one count of attempted murder (Count 7), two counts of aggravated burglary (Counts 9 and 10), and four counts of having weapons while under a disability (Counts 11 through 14). Counts 1 through 10 had accompanying one- and three-year firearm specifications. Counts 11 through 14 also had forfeiture specifications.

{¶ 12} The day before trial was scheduled to begin, the state sought a material witness warrant for Brown because it had been unable to locate her. The state had issued subpoenas to multiple locations,[2] and detectives had tried to contact

---

[2] In his brief and at oral argument, appellant, through counsel, disputed the state's assertion that it had served the subpoenas at "multiple locations" and accused the state of making "patently false" representations regarding the issuance of the subpoenas, which the state vehemently denied. As will be fully discussed below, we need not determine this issue.

her numerous times. The court granted the warrant request but did not move the trial.

{¶ 13} Brown later appeared at court that afternoon without the execution of the warrant and voluntarily testified regarding Graham's murder. The state also presented the testimony of Rick Graham, the victim's brother; Cleveland Police Officer Stevie Green; Cleveland Police Detective Shane Bauhof; Macie Kalinowski, a civilian analyst in the Cleveland Police Department Real Time Crime Center; Dr. Thomas Gilson, the director of the Cuyahoga County Medical Examiner and Crime Laboratory; Eric Strick, a crime scene detective with the Cleveland Police Department; Matthew Seabold, a crime analyst with the Cuyahoga County Prosecutor's Office; Cleveland Police Detective Lisette Gonzalez; Lisa Moore of the DNA Department of the Cuyahoga County Regional Forensic Science Laboratory; Steven Gamble, who worked in Information Technology for the City of Cleveland, Public Safety; Thomas Morgan, of the firearm and toolmark section of the Cuyahoga County Regional Forensic Science Laboratory; and Cleveland Police Detective Raymond Diaz.

{¶ 14} The jury found appellant guilty on all counts except the attempted murder count, which related to Brown. He was sentenced to an aggregate term of 31 years to life. Appellant then filed the instant appeal, raising three assignments of error for our review:

> 1. The trial court erred in issuing a material witness warrant where the state's efforts were insufficient to establish probable cause that a

material witness warrant was necessary, and probable cause was not established that the witness would not appear at trial.

2. Trial counsel was ineffective for failing to object to cell phone map testimony by a non-expert witness who was an employee of the Cuyahoga County prosecutor's office.

3. Appellant's convictions are against the manifest weight of the evidence; therefore, his convictions are in violation of the Ohio state constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

## II. Law and Analysis

### A. Material Witness Warrant

{¶ 15} In his first assignment of error, appellant argues that the trial court erred in granting a material witness warrant for Brown.

{¶ 16} Pursuant to R.C. 2937.16 through 2937.18 and R.C. 2941.48, a material witness warrant may be issued to secure the presence and testimony of a witness at trial. However, the protections afforded by the Due Process Clause of the United States Constitution must be observed in order to deprive witnesses of their liberty. *State ex rel. Dorsey v. Haines*, 63 Ohio App.3d 580, 582, 579 N.E.2d 541 (2d Dist.1991). A material witness warrant "'must be supported by probable cause, supported by oath or affirmation, to believe that the witness is material and that the detention of the witness is necessary to procure her attendance at trial.'" *State v. Hollins*, 8th Dist. Cuyahoga No. 103864, 2016-Ohio-5521, quoting *Haines* at 581.

{¶ 17} The requirements for the issuance of a material witness warrant set forth above are necessary to protect the due process rights of the witness, not the defendant. *See State v. Eatmon*, 8th Dist. Cuyahoga No. 108786, 2020-Ohio-3592,

¶ 32, quoting *Robinson v. Green*, 7th Dist. Mahoning No. 16 MA 0134, 2016-Ohio-5688, ¶ 9, quoting *Haines* at 581. This court has previously noted that it "could find no Ohio case where a defendant successfully appealed the grant of a material witness warrant in an effort to vindicate the due process rights of a witness because the warrant was not supported by probable cause, or oath or affirmation." *State v. Kidd*, 8th Dist. Cuyahoga No. 109126, 2021-Ohio-503, ¶ 11. We further noted that "[w]itnesses have the ability to vindicate these due process rights on their own." *Id.,* citing *State v. Jeffery*, 2d Dist. Montgomery No. 24850, 2012-Ohio-3104. As such, a defendant lacks standing to raise potential violations of the rights of a witness. *State v. Rice*, 2019-Ohio-1415, 135 N.E.3d 309, ¶ 44-50 (11th Dist.).

{¶ 18} In the case sub judice, appellant is not simply asserting the rights of the witness but is also maintaining that his own rights were violated by the state making "patently false" misrepresentations in order to obtain the warrant. We do not need to resolve this issue, though, because the warrant was never executed and Brown voluntarily testified at trial. Any argument regarding the warrant has therefore been rendered moot.

{¶ 19} Appellant's first assignment of error is therefore overruled.

## B. Ineffective Assistance of Counsel

{¶ 20} In his second assignment of error, appellant argues that his counsel was ineffective by failing to object to cell phone map testimony by a nonexpert witness. He contends that the evidence regarding the locations of towers to which appellant's cell phone connected on the night of the murder was unreliable and

should have been provided by an expert, rather than by Matthew Seabold ("Seabold"), a crime analyst in the prosecutor's office, who was merely a lay witness. Further, appellant asserts that he was prejudiced by the testimony because the state placed considerable weight on it, arguing that it was all they needed to convict him.

{¶ 21} In order to establish ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's performance was deficient and fell below an objective standard of reasonableness and (2) that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the trial would have been different. *State v. Jenkins*, 2018-Ohio-483, 106 N.E.3d 216, ¶ 28 (8th Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The defendant must satisfy both prongs of the test in order to prove ineffective assistance of counsel. *Harris*, 8th Dist. Cuyahoga No. 109083, 2020-Ohio-4138, at ¶ 28, citing *Strickland* at 687.

{¶ 22} Under Ohio law, "every properly licensed attorney is presumed to be competent." *State v. Knight*, 8th Dist. Cuyahoga No. 109302, 2021-Ohio-3674, ¶ 47, citing *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 35 (8th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Therefore, when "evaluating counsel's performance on a claim of ineffective assistance counsel, the court must give great deference to counsel's performance and 'indulge a strong presumption' that counsel's performance 'falls within the wide range of reasonable professional assistance.'" *Id.*, quoting *Strickland* at 689.

{¶ 23} "Objecting is a tactical decision." *State v. Frierson*, 2018-Ohio-391, 105 N.E.3d 583,¶ 25 (8th Dist.), citing *State v. Johnson*, 7th Dist. Jefferson No. 16 JE 0002, 2016-Ohio-7937, ¶ 46. Accordingly, "'the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel.'" *Id.*, quoting *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 103.

{¶ 24} Regardless, we have repeatedly found cell phone map testimony by a lay witness admissible. *State v. Dunn*, 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, ¶ 43-46 (A layperson could compare the locations depicted on the phone records to the corresponding location on the analyst's site map.); *State v. Daniel*, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 68-72 (8th Dist.) (testimony regarding a comparison of cell phone date records to locations where crimes occurred does not require "specialized knowledge, skill, experience, training, or education" regarding cellular networks); *State v. Bradford*, 2018-Ohio-1417, 101 N.E.3d 710, ¶ 86 (8th Dist.), citing *State v. Wilson*, 8th Dist. Cuyahoga No. 104333, 2017-Ohio-2980 (cell phone tower mapping by a lay person permits an inference to be drawn by the factfinder that the cell phone owner was in the area at the listed time and to corroborate other evidence of the defendant's presence at a crime scene); *State v. Lucus*, 2020-Ohio-1602, 154 N.E.3d 262, ¶ 98 (8th Dist.) (testimony about the defendant's cell phone records, the location of the cellular tower defendant's phone connected to, or a map based on this information was admissible as lay testimony).

{¶ 25} In light of the foregoing, we find that Seabold's testimony was admissible as lay testimony. Accordingly, any objection by appellant's trial counsel

to the presentation of such testimony would have been meritless. "The failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial." *State v. New Bey*, 8th Dist. Cuyahoga No. 109424, 2021-Ohio-1482, ¶ 58, citing *State v. Kilbane*, 8th Dist. Cuyahoga No. 99485, 2014-Ohio-1228, ¶ 37.

{¶ 26} Appellant has not demonstrated that his counsel was ineffective or that he was prejudiced by counsel's failure to object to the cell phone map testimony. Appellant's second assignment of error is overruled.

## C. Manifest Weight of the Evidence

{¶ 27} In his third assignment of error, appellant argues that his convictions were against the manifest weight of the evidence. Specifically, he contends that (1) there was no DNA or ballistics linking him to the incident; (2) the cell phone tower testimony was unreliable; (3) there was no testimony regarding the license plate of the vehicle seen on the surveillance video in order to definitively tie it to appellant; (4) there was no evidence that appellant knew where Brown lived; (5) there was no evidence that appellant had any motive to harm Graham; and (6) Brown did not believe that appellant was the shooter when questioned after the incident and only identified him later after meeting with Graham's brother.

{¶ 28} When reviewing a manifest weight challenge, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Martin* at 175.

{¶ 29} As this court has previously stated:

The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 1997-Ohio-52, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id.* Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87.

{¶ 30} In its role as the "thirteenth juror," an appellate court must review the entire record, weigh the direct and circumstantial evidence and all reasonable inferences drawn therefrom, and consider the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the [trier of fact] clearly

lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *Martin*. "Direct evidence exists when 'a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish.'" *State v. Wachee*, 8th Dist. Cuyahoga No. 110117, 2021-Ohio-2683, ¶ 36, quoting *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Conversely, "circumstantial evidence requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *Id.,* quoting *id.* "'Circumstantial evidence is proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.'" *Id.,* quoting *State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37. "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 Ohio St.3d 259, 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶ 31} In the instant matter, Brown testified that, at the time of the shooting, it was very dark outside, and she could only see that someone was standing outside with a gun who was tall and had a "bald or low cut." She further testified to receiving missed calls and text messages from "My Giant," which was her nickname for appellant, minutes prior to the shooting. The text messages stated that appellant was "on [his] way" and that she should tell her "side" to leave.

{¶ 32} When police initially asked Brown if she thought the shooter was appellant, she wanted to "give him the benefit of the doubt" and told them that she

was "almost sure that it wasn't him." However, Brown further testified that during her second interview with police, she told them that she was sure the shooter was appellant. She had called appellant the morning after the shooting on speakerphone while her sister and Graham's brother were present. During the call, she asked appellant why he had called her the night of the murder and what time he got home. He told her that he had been at The Dstrkt Lounge, was drunk, and had arrived home at 2:54 a.m. Brown testified that she changed her mind and decided that appellant was the perpetrator because of the text messages he sent and the specific time that he stated he arrived home.

{¶ 33} In addition to Brown's testimony, the prosecution presented a strong circumstantial case to establish the identity of the shooter. "Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence — circumstantial evidence carries the same weight as direct evidence." *Cassano* at ¶ 13, citing *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). "A conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 154-55, 529 N.E.2d 1236 (1988).

{¶ 34} In this case, the state presented the cell phone mapping data that showed appellant near The Dstrkt Lounge and then moving eastbound toward Brown's residence. At the time the shooting occurred and the 911 call was made,

appellant's cell phone had connected with the tower that was in the general area of the crime scene.

{¶ 35} In addition, there was testimony presented that Brown and appellant were previously in a relationship. They had reconnected in the weeks prior to Graham's murder and had been communicating via cell phone. Appellant lied during his interview with police and stated that he had not talked to Brown. The state presented the text messages sent between appellant and Brown since they had reconnected, including the ones sent by appellant minutes before the shooting, stating that he was on his way and telling her to have her "side" leave.

{¶ 36} Further, a silver Mercedes Benz was seen on surveillance video driving from The Dstrkt Lounge to East 47th St., which the jury was able to view. The vehicle stopped on East 47th St. for a few minutes, then departed, heading east. Appellant had registered a 2015 silver Mercedes Benz in his name only three months prior to the murder. Yet, when police asked him to list the vehicles registered in his name, he did not mention the Mercedes Benz.

{¶ 37} Brown had appellant's number saved in her phone under "My Giant" and mentioned the same to him during their initial text messages after reconnecting at the gas station. But when asked by police about the nickname, appellant denied any knowledge of it.

{¶ 38} Regarding the lack of direct physical evidence linking appellant to the shooting, as we have explained, circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned. All that is

required of the jury is that it weighs all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. Having reviewed the entire record, we cannot say the jury in this case clearly lost its way and created such a manifest miscarriage of justice that appellant's convictions must be reversed and a new trial ordered.

{¶ 39} Appellant's third assignment of error is overruled.

### III. Conclusion

{¶ 40} The trial court did not err in ordering the material witness warrant, and appellant did not receive ineffective assistance of counsel. Appellant's convictions were not against the manifest weight of the evidence.

{¶ 41} All of appellant's assignments of error are overruled, and the judgment of the trial court is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
SEAN C. GALLAGHER, J., CONCUR